UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-cr-20221-GAYLES

UNITED STATES OF AMERICA

vs.

CARLOS BASAURI-COTO

       Defendant

                                   /

**DEFENDANT CARLOS BASAURI-COTO'S SENTENCING MEMORANDUM
AND INCORPORATED MEMORANDUM OF LAW**

Defendant Carlo Basauri-Coto ("Carlos"), through undersigned counsel, respectfully submits this sentencing memorandum pursuant to 18 U.S.C. § 3553 and *United States v. Booker,* 543 U.S. 220 (2005), and requests that the Court impose a sentence beneath the advisory sentencing guidelines' recommendation.

**INTRODUCTION**

Carlos is a 33-year-old man who has lived his entire life in Mexico in a home with his mother and siblings, working for his family shoe business. Outside of this case, Carlos has never had any trouble with law enforcement. Carlos' actions in this case represent the biggest mistake of his life, for which he has taken responsibility. Nonetheless, Carlos did not *initially* intend to launder illegal proceeds, nor did he understand that was getting mixed up with an illegal conspiracy. In fact, the Government agrees that Carlos was lied to about the nature of the funds he was accepting, and that his role in the conspiracy was limited. Despite this, Carlos ultimately recognized the actions that led him here. For nearly two years, Carlos has been incarcerated in the United States, more than a thousand miles separated from his family and fiancé. In those two years, he faced unfortunate conditions as a result of a prison struggling with Covid, starting with a month straight

of solitary confinement, followed by extended periods of 22-hour-per-day lockdown, a lack of access to critical medical care, inability to care for his basic hygiene, and the stress of living in constant fear of his physical safety due to the inherent nature of the other inmates he is surrounded by. Carlos' conduct also severely impacted his family. He ruined his own wedding, which was scheduled to take place last year, and caused significant stress for his family in Mexico, who have had very limited ability to visit him during his incarceration. This punishment – aside from any sentence the Court imposes – has impacted Carlos severely in ways he will never forget, and assured that he will never again break the law.

## APPLICABLE SECTION 3553(A) FACTORS

The Court must consider all 3553(a) factors before imposing a sentence. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). Post-*Booker*, the Eleventh Circuit has repeatedly affirmed courts that have imposed below-guideline sentences based on the 3553(a) factors. S*ee, e.g., United States v. Clay*, 483 F.3d 739 (11th Cir. 2007) (affirming 128-month downward variance based on post-offense rehabilitation); *United States v. Gray*, 453 F.3d 1323 (11th Cir. 2006) (affirming 79-month downward variance); *United States v. Williams*, 435 F.3d 1350 (11th Cir. 2006) (affirming 98-month downward variance). Among the 3553(a) factors most applicable here are the nature and circumstances of the offense and the history and characteristics of the defendant, the needs for the sentence imposed to reflect the seriousness of the offense and to create general and specific deterrence, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims of the offense.

**LEGAL ARGUMENT**

I.     **REGARDLESS OF HIS SENTENCE, CARLOS WILL NOT REOFFEND.**

Carlos' conduct in this case is a single outlier in the life he has led as a humble and law-abiding citizen. After facing the consequences of his actions, the Court can be assured that Carlos will never reoffend.

    a. **Carlos' personal characteristics and history support that he will not reoffend.**

Congress has directed that a defendant's personal characteristics should be considered equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). "The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition . . . employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are. . . matters that § 3553(a) authorizes the sentencing judge to consider." *Rita v. United States*, 551 U.S. 338, 364-65 (2007); *see also United States v. Prosperi*, 686 F.3d 32, 39 & 45 (1st Cir. 2012) (affirming downward variance from 87-108 months to home detention because the loss numbers did not take into account the personal characteristics of the defendant); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance below the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation").

Carlos is a life-long resident of Mexico, who grew up in a tight-knit, middle class family. Carlos was born on April 20, 1989, in Mexico City. His parents, Begoña Coto and Alberto Basauri, divorced when Carlos was 17 years old. Carlos lived with his mother in the same home in Mexico for over 30 years with his brothers, up until his arrest. Carlos attended catholic school and continued on to college, where he received a college degree in Business Administration. Carlos

maintained a close relationship with his parents, who raised him to be an honest man and served as great role models.

Carlos' mother Maria works for a family-owned shoe store called "Zapaterias La Ribera," where Carlos also worked for almost twenty years. Maria remains supportive of Carlos, as are his two brothers. Being apart from his family for the nearly two years that he has been detained has been difficult on Carlos and his family. When he was 25 years old, Carlos met Loren Rich, who also resides in Mexico and works for a manufacturing company. For the eight years, Carlos and Loren have been in a relationship, and Loren remains supportive of Carlos despite his incarceration. Carlos and Loren were planning to get married on November 13, 2021, but have postponed their marriage as a result of this case. Of all the consequences Carlos faces, his biggest regret is for the stress and anguish he has caused his family.

b. **The conditions Carlos endured while incarcerated have sufficiently punished him and adequately deterred him from reoffending.**

The Court must ensure that the sentence imposed is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, generate specific and general deterrence, and protect the public. 18 U.S.C. § 3553(a)(2). Courts have "rejected the view that the interest in general deterrence could only be served by incarceration." *United States v. Prosperi*, 686 F.3d 32, 45 (1st Cir. 2012). The Eleventh Circuit in *United States v. Clay* stressed that a sentencing court is "require[d] ... to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." 483 F.3d 739, 745 (11th Cir. 2007). Because the defendant in that case had "fundamentally changed since his offense" and "poses a lesser risk to the community," the Eleventh Circuit agreed with the sentencing court's decision to issue a variance. *Id.* at 746.

On March 30, 2021, Carlos was arrested and detained at FDC Miami, and sent directly to solitary confinement. Until that date, Carlos had never been denied or separated from visiting his family. But for the following 25 days straight, Carlos endured difficult conditions where he remained in his cell alone around the clock, receiving only one 30-minute break every three days. During that 30-minute "break," Carlos was forced to choose between either a shower or a phone call, because he was not permitted to have both. After nearly a month in solitary confinement, Carlos was moved to another floor, but remained in "lockdown" in his cell for an average of 22 hours each day. This continued for 11 months. In addition to the mental impact of solitary confinement, Carlos has faced severe physical danger and threats. Although he is a first-time, non-violent offender, Carlos is surrounded by inmates of all offenses, including violent offenders, and inmates serving life sentences or facing the death penalty. These inmates are aggressive, fight, pay one another to stab inmates, and cause Carlos to live in constant fear of his safety.

Being incarcerated has also caused medical problems for Carlos. Carlos suffers from a gastric condition that requires medication. For months, Carlos was deprived of medical care or treatment for his condition, despite multiple requests and intervention by his attorney. During his time incarcerated, there have been just two to four functioning showers for 120 inmates, which severely limits their ability to use them. Additionally, Carlos and his cell-mate have a toilet that was broken for four months, which required them to fill it up with buckets of water for each use. On top of these conditions, inmates were not permitted commissary for a three-month period, which left Carlos and others literally digging for food through trash cans. Although he was never a smoker, Carlos is constantly surrounded by individuals who smoke, and experiences troubling side-effects including dizziness and constant headaches.

Carlos' mental and emotional health have also suffered. For nine months, inmates were not permitted any family visits. Incarceration has also forced Carlos to forego religious services. Despite his multiple requests, Carlos has had very limited ability to see a priest or attend any catholic religious services. As a devout catholic who has attended services consistently for his entire life, and especially in the face of the difficult conditions he faces incarcerated, this deprivation is particularly troublesome for Carlos.

Carlos has taken full responsibility for his actions knowing that he could face significant punishment. These severe conditions of his incarceration – even before he has been sentenced – have gone taken a toll on him both physically and mentally, which is more than enough to deter Carlos from future criminal conduct, and to adequately punish him for his actions.

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A DOWNWARD VARIANCE.

The law requires the Court to consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). The Supreme Court has affirmed that a sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Although he admitted to his wrongdoing upon arrest and acknowledges his illegal actions, Carlos did not initially set out to commit a crime. Carlos' criminal conduct was one small part of a larger conspiracy and, although he does not downplay his involvement, the Court should consider these details in determining an adequate sentence.

### a. Carlos played a minor to minimal role in the crime, especially in comparison to his co-conspirators.

In cases involving multiple co-conspirators such as this, sentencing disparities among co-conspirators are only justified if based on legitimate distinctions, such as where only one co-conspirator pled guilty and cooperated with the Government, played a more significant role than others in carrying out the offense, or had a lengthy criminal record. *See United States v. Scott,* 403 F. App'x 392, 399 (11th Cir. 2010) (citing *United States v. Williams,* 526 F.3d 1312, 1313 (11th Cir. 2008)). Here, the Court should determine that a downward variance is required to prevent sentencing disparities between Carlos and his co-conspirators. Under the guidelines, "if the defendant can establish [he] played a relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in any larger criminal conspiracy—[then] the district court [should] grant a downward adjustment for [a] minor role in the offense." *United States v. Rodriguez De Varon,* 175 F.3d 930, 944 (11th Cir. 1999) (en banc). *See also* 18 U.S.C. § 3B1.2 application n.3(C) (a minor role adjustment may be applied upon considering the defendant's decision-making authority, participation in organizing the criminal activity, and actions during the commission of the crime). The guidelines define a "minimal participant" as someone "who plays a minimal role in the criminal activity." This definition applies to "defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant."

Carlos acknowledges that after the March 28, 2021, he should have left and gone back to Mexico, never speaking the Alfonso Rustrian ("Rustrian") and the Confidential Source ("CS") again. However, in considering the nature and circumstances of the offense, the Court should consider that Carlos did not enter the conspiracy at the beginning; in fact, Carlos was intentionally

7

and repeatedly deceived by his close friend and the CS just to ensure that Carlos would remain in Miami and agree to pick up the money. Carlos was not involved in many of the more egregious aspects of the crime. Unlike his co-conspirators, Carlos never knew about, intended to, obtained or transported any unlawful substance. *See* ECF No. 133 at 11. Carlos did not negotiate the terms or amount of the import. *Id.* As noted below, it was the CS who discussed and described how to move the funds through the accounts and the steps Carlos should take when moving the funds. In fact, Carlos had no idea that he was being asked to assist with a money transaction that had anything to do with something illegal until long after that point, when he was actually making the transaction. Instead, Carlos arrived in Miami to pick up and wire $1 million USD through his accounts as repayment for a previous investment. The remaining amount, which is agreed totals no more than $2,500,000, was to be taken by Carlos to a parking lot in Aventura. However, unbeknownst to Carlos, the CS had specifically arranged with Rustrian, that the CS's own people would be meeting Carlos at the parking lot and taking the money. Thus, the CS gave Carlos a bag of fake cash with an amount solely determined by the Government, with the intent to have the CS's own men pick it up from Carlos. *Id.* Additionally, the CS and Rustrian repeatedly discussed deceiving Carlos regarding the illegal nature of the deal, and it was not until the very last meeting that Carlos could have reasonably believed that the money he was receiving was the result of an illegal activity. It was not until the final meetings that the CS decided to go against his agreement with Rustrian and mention that there may be an illegal activity occurring. For these reasons, the Government does not object to Carlos' request for a minor participant reduction under USSG Section 2B1.2(b) and the Probation Officer specifically endorses the reduction. *See* ECF No. 113 at 3.

### b. It is undisputed that Carlos was not predisposed to commit a crime – much less to launder money for a drug operation.

Initially, Carlos did not set out to enter a criminal conspiracy, launder money, let alone be involved in a drug transaction, or to commit any kind of crime. Carlos became involved through Rustrian, who was a trusted college friend. Rustrian owned a security company and, after a few years of friendship, offered Carlos an opportunity to invest in another opportunity, a tent business, which he did. Rustrian did not make payments to Carlos as promised, and gave multiple excuses each time Carlos asked over the next two years. Two and a half years after Carlos had invested his money into Rustrian's business with no return, Rustrian told Carlos that he was going to pay back the money. Rustrian told Carlos that he was in charge of administering a project and Carlos would soon be paid. Rustrian then said he had been contacted by an employee from the United States government, who asked Rustrian to work for them and manage upcoming projects. In fact, Rustrian had recruited Carlos, because Rustrian was having an issue with his U.S. visa, could not travel to the U.S. to pick up the money, and needed someone to take his place. From there, the elaborate plan to deceive and entice Carlos to come to the U.S. with the story of finally being repaid was hatched. Six months after, Rustrian introduced the United States government employee to Carlos, who turned out to be the confidential source.

Carlos understands that there came a point where he buried his head in the sand, ignored the signs, and reasonably should have believed and suspected that he was being asked to launder potential "illegal proceeds" or from "something illegal". *See* ECF No. 112 at 2 & 4. After months of waiting in Miami, missing his best-friend's wedding, being separated from his family, Carlos' frustration and desire to repaid, and to help his good friend, took over from his common sense. However, it is undisputed that the CS was instructed that Carlos "should not know where the money was coming from." *Id.* at 2. Withholding this information from Carlos up front was critical

9

because Carlos would never had traveled to Miami or meet with the CS; Carlos was not predisposed to commit a crime and would not have continued his involvement otherwise, and Rustrian knew that, which is why he told the CS to continue to deceive Carlos about what was going on with the transaction.

It is also undisputed that prior to his first meeting with the CS, Carlos did not know that the money would come from drugs, and it was solely the CS who discussed the varying amounts involved. In that way, the CS influenced the applicability of § 2S1.1. Courts have recognized that the sentencing guidelines "have a terrifying capacity for escalation of a defendant's sentence" and that, therefore, the "danger of government abuse is great". *United States v. Searcy*, 233 F.3d 1096, 1099 (8th Cir. 2000). With that in mind, courts have considered the impact of the actions of confidential sources on the sentencing guidelines when weighing sentencing decisions. *See, e.g., United States v. Webb*, 134 F.3d 403 (D.C. Cir.1998) (district court departed downward from the guideline range due to an undercover police officer making multiple drug buys from the defendant before finally arresting him). Although the involvement of a CS certainly does not excuse Carlos' actions, he respectfully submits that it is relevant to the greater context of his knowledge and involvement, and warrants consideration by the court in connection with the nature and circumstances of the offense. *See United States v. Bigley*, 786 F.3d 11, 12 (D.C. Cir. 2015) (failing to consider argument that undercover officer had manipulated defendant's sentence was plain error).

### III. CONCLUSION

For the reasons stated above, the Court should use its discretion to devise a sentence that will provide justice individualized to Carlos while accounting for the nature and circumstances of his limited role in the offense, as well as the punishment and deterrence he has already faced. *See*

*Gall,* 552 U.S. at 59–60. A significant variance would achieve the means of justice in this case, and permit Carlos, upon release, to continue the productive, law-abiding life he maintained his entire life outside this case.

Dated: December 27, 2022                    Respectfully submitted,

**STUMPHAUZER FOSLID SLOMAN ROSS & KOLAYA, PLLC**
2 S. Biscayne Blvd., Ste. 1600
Miami, FL 33131
Tel.:   (305) 614-1400
Fax:   (305) 614-1425

By: */s/ Michael Nadler*
Michael Nadler (Fla. Bar No. 51264)
Jacqueline DerOvanesian (Fla. Bar No. 125662)
Email:  mnadler@sknlaw.com
            jderovanesian@sknlaw.com

*Counsel for Carlos Basauri Coto*

## CERTIFICATE OF SERVICE

I certify that on this 27th day of December, 2022, I electronically filed this document with the Clerk of the Court using CM/ECF, causing a copy to be served on counsel of record.

/s/ *Michael B. Nadler*
Michael B. Nadler

11